IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 14, 2020

**STATE OF TENNESSEE v. DENNIS LEE SEALE**

**Direct Appeal from the Circuit Court for Lewis County**
**No. 2017-CR-141       Michael Binkley, Judge**
_____

**No. M2019-01913-CCA-R9-CD**
_____

The Defendant, Dennis Lee Seale, filed a Rule 9 interlocutory appeal seeking our review of the trial court's ruling that some of the prosecution's out-of-state witnesses could testify at trial via two-way video conferencing technology. After a hearing, the trial court ruled that four of the prosecution's witnesses could testify via teleconferencing rather than in person. The Defendant filed an application for an interlocutory appeal, which the State did not oppose, and which the trial court granted. This court determined that this application met the criteria of Rule 9, and granted the appeal. On appeal, the Defendant contends that the trial court erred because its ruling violated his rights pursuant to the Confrontation Clause of both the Federal and our State constitution. After a thorough review of the record and applicable authorities, we conclude that this case, as one of first impression in this state, provides this court the opportunity to hold that the standard as articulated in *Maryland v. Craig*, 497 U.S. 836 (1990), should extend to two-way video conferencing technology. As such we reverse and remand this case to the trial court for a case-specific and witness-specific determination of whether the denial of the Defendant's right to confront witnesses is necessary to further an important public interest.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Reversed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

John S. Colley, III, Columbia, Tennessee, for the appellant, Dennis Lee Seale.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Kim R. Helper, District Attorney General; and Stacey Brackeen Edmonston, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## I. Facts

This case arises from allegations that the Defendant burglarized the victim's home and then murdered him. In 2017, a Lewis County grand jury indicted the Defendant for: the first-degree premeditated murder and the felony murder of Brian Deavers; the especially aggravated burglary of Mr. Deavers's home; being in possession of a firearm during the commission of a dangerous felony; and vandalism. The Defendant moved to continue the trial, set for January 28, 2019, due to a delay in forensic testing. The trial court reset the trial date for July 22, 2019.

On July 12, 2019, the State filed a motion requesting that four of the prosecution's witnesses, all of whom were from Virginia, be allowed to testify via teleconferencing technology, namely "Microsoft Teams," the software used by the District Attorneys General Conference.[1] Those four witnesses were: James Reed; Sharon Wolfrey[2]; Lyle Durrer; and Judith Seale.

The trial court held a hearing on the State's motion on July 16, 2019, during which the parties presented the following evidence: The State offered argument about why each of the witnesses should be allowed to testify via teleconferencing. It stated that James Reed's wife suffered from dementia and had a recent cancer diagnosis, and Mr. Reed was her sole caretaker. The two of them lived together in Virginia, and traveling to Tennessee would be difficult in light of these circumstances. The second witness, Sharon Wolfrey, who was Mr. Reed's assistant, also lived in Virginia and had also been diagnosed with cancer. She was undergoing cancer treatment, so the State asked that she also be able to testify via "Skype." The third witness, Lyle Durrer, had a son who was starting college orientation the following week, and Mr. Durrer stated it would be difficult for him under those circumstances to make the eleven-hour drive to Tennessee. The final witness, Judith Seale, who was the Defendant's mother, informed the State that it would be extremely burdensome on her emotionally to come to the trial and asked for an accommodation.

The State offered affidavits for two of the four witnesses. Mr. Durrer's affidavit indicated that he sold the Defendant a firearm and ammo from Mr. Durrer's store. Mr. Durrer swore that he could not attend the Defendant's trial because it interfered with his son's college orientation.

---

[1] For purposes of this appeal, we will refer to the technology generally, as our holding is general and does not apply only to the specific software proposed to be used herein.

[2] Some places in the transcript spell this witness's last name "Wolfrey" and others spell it "Wolfree." For clarity and consistency, we will use the "Wolfrey" spelling.

The State also offered Mr. Reed's affidavit. In it, Mr. Reed described his wife's health issues, including dementia and cancer, and his inability to leave Mrs. Reed because he was her sole care provider. The State additionally offered Mr. Reed's wife's doctor's affidavit, which stated that she was unable to travel.

The State did not present affidavits from Ms. Wolfrey or Ms. Seale, but relied on its statements that Ms. Wolfrey was also battling cancer and that Ms. Seale had said coming to court would be "extremely burdensome on her emotionally" and that her testimony would take only thirty minutes, as she was only being called to authenticate the Defendant's jailhouse phone calls to her during which the Defendant made inculpatory statements.

The State explained that the teleconferencing software allowed for the judge and both attorneys to see a witness, and the witness to see those parties. It then allowed for a screen to project the witness so the jury could see them testify. The State noted that this would be live, and not prerecorded testimony, and that the Defendant's attorney would be afforded the ability to cross-examine the witness, which the State submitted satisfied the Confrontation Clause.

The Defendant's counsel submitted that Tennessee case law has held that the Defendant must be afforded the right to confront the witnesses face to face. Counsel then noted that this was a "high stakes" first degree murder case, and the witnesses referenced by the State were important to the prosecution's case. Mr. Reed, in fact, planned to testify whether the Defendant was with him at the time of the shooting. Further, the Defendant's mother planned to identify the Defendant's voice in a jail recording that contained "very, very damaging admissions about [the Defendant's] participation in this shooting."

The trial court first noted that this was an "interesting issue" and that, as an issue of first impression, could be decided either way. It found:

I think the laser focus is, if [the Defendant] is going to receive and have his right of confrontation through this method of providing long distance testimony balanced against the need of these witnesses to use [teleconferencing software] instead of having to be here personally. Now, there's being here personally and then being personally available through [teleconferencing software]. I think there's a difference in that, but it may not be a distinguishing difference when it comes to the right of confrontation. In other words, is the [D]efendant going to have his right of confrontation met in the same manner as if these witnesses were here in the courtroom live testifying as they would with [teleconferencing software],

that's really the issue here, are we giving him the same exact protection that he deserves and that the Constitution requires if we're doing it by [teleconferencing software].

The trial court then offered the following instructive findings:

The confrontation clause of the Sixth Amendment to the United States Constitution says -- and this is what we're really kind of balancing it all against – in all criminal prosecutions, the accused shall enjoy the right to be confronted, the pertinent part, with the witnesses against him. In addition, [the defense attorney is right that] [t]he Tennessee Constitution provides a little bit different protection than I think a broader protection than the United States Constitution. In Article 1, Section 9 of the Tennessee Constitution it says that in all criminal prosecutions, the accused . . . have the right to meet the witness face to face. . . . Traditionally, the Tennessee courts have interpreted the right of confrontation as affecting two types of protections for criminal defendants just like in this case. The right to physically face the witness who testifies against the defendant and the right to cross-examine those witnesses through counsel.

I do not think *McCoy* really applies to the facts of the case that we have here currently, but it is instructive, it's helpful. *Deuter*, . . . is helpful and I believe comes closer to defining the parameters of the right of confrontation, not only under the U.S. Constitution but also the Tennessee Constitution.

Now, in reviewing the pertinent case law, these are the -- for lack of a better term -- pressure points that I think the Court needs to consider in weighing the right of physical face-to-face confrontation and the witnesses' inability to be present in the courtroom to testify. First of all, does the reason for the witnesses' inability to appear physically in the courtroom, does that rise to the level presented by the affidavits that we do have to excuse those witnesses from appearing physically in court? I think they do. I think they do, but I'm going to balance that with a confrontation clause in a moment. So to ensure that we don't violate the confrontation clause we need to know whether or not the equipment, that is the software, . . . program is reliable. In other words, are we going to, in essence, meet the parameters of the confrontation clause where the person is testifying as if live, and the other second prong is whether or not this defendant will be able to enjoy the second part of the confrontation clause, and that is to cross-examine these witnesses who are testifying in a remote fashion.

- 4 -

The testimony of these witnesses, as I understand it with the program that is going to be utilized, will be in real time. There will be no actual delay. I'm not too sure that really matters, but in this particular case it is as live as it can be as if these witnesses were personally in the courtroom. So the testimony, if the software works the way it should work, will be, in my opinion, as good as the person being here live. The [D]efendant . . . and his lawyer [will] be able to observe . . . the witness' demeanor, [and] . . . how the witness responds to questions. In other words, we all know that it is important for the jury, finder of fact, as well as the attorneys to be able to observe the demeanor of witnesses when they testify. You get a lot from that on the issue of creditability so I don't think the issue of creditability and the right of confrontation through cross-examination is an issue because it is as live as we can get it without the person being actually present in the courtroom. I also think the software, it appears to be software that will be accurate and portray exactly what is being testified to step by step.

In balancing [the Defendant's] right to confrontation under the U.S. Constitution and the more stringent, in my opinion, right of confrontation . . . under the Tennessee Constitution . . . against the necessity of these witnesses appearing by [teleconferencing technology] and trying to insure in that balance that the [D]efendant receives his right of confrontation as to both parts under the Constitution, it appears to me that he will receive the same exact right as if the witness was here testifying in the courtroom live. It is another reflection of the way we all communicate. Long distance communication is something that is used all the time. It's really important to make sure, regardless of whether or not it is used all the time in business or in any other fashion, it is always important, in my opinion, regardless of all of that. When we're talking about someone's constitutional rights, it meets a higher scrutiny, in my opinion, to make sure this gentleman gets exactly what everyone in this room has and that's all of your rights under the Tennessee Constitution as well as the U.S. [C]onstitution. That's the way I see it.

So to respond to the laser point that I made at the very beginning, is this gentleman going to receive exactly what he deserves under his right of confrontation, not only to observe and watch the witnesses who are testifying against him, but also have the right to cross-examine those witnesses. I believe he receives exactly the same rights as if . . . the witnesses were live testifying in the courtroom.

I will allow the witnesses to testify by [teleconferencing technology] . . . .

The Defendant requested a Rule 9 interlocutory appeal, and the trial court agreed that his request met the applicable standards. We agreed and granted the Defendant's request for interlocutory appeal.

## II. Analysis

On appeal, the Defendant contends that allowing witnesses in a criminal prosecution to testify against him via teleconferencing software violates his right to confrontation under the Sixth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution. The State counters that the Tennessee Constitution does not afford any greater protections than the United States Constitution and that the United States Supreme Court has held that teleconferencing software does not violate the Confrontation Clause where there is a sound public policy reason to use such technology. *See Maryland v. Craig*, 497 U.S. 836, 855-57 (1990). The State further contends that those public policy reasons exist in this case, so the trial court did not err when it held that the four witnesses could testify via teleconferencing software.

Generally, questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion in the absence of a clear showing of abuse appearing on the face of the record. *State v. McCoy*, 459 S.W.3d 1, 8 (Tenn. 2014) (citations omitted). Issues of statutory and constitutional interpretation are questions of law, which this court reviews *de novo* without any presumption of correctness given to the legal conclusions of the courts below. *McCoy*, 459 S.W.3d at 8 (citations omitted).

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Article 1, section 9 of the Tennessee Constitution states:

> That in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof, to meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor, and in prosecutions by indictment or presentment, a speedy public trial by an impartial jury of the County in which the crime shall have been committed, and shall not be compelled to give evidence against himself.

- 6 -

"It has long been held that the Confrontation Clause of the Sixth Amendment and art. I, § 9 of the Tennessee Constitution provide two protections for criminal defendants: the right to *physically face* witnesses and the right to cross-examine witnesses." *State v. Brown*, 29 S.W.3d 427, 430-31 (Tenn. 2000) (emphasis added) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Middlebrooks*, 840 S.W.2d 317, 322 (Tenn. 1992)). "The Confrontation Clause is designed 'to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.'" *McCoy*, 459 S.W.3d at 13 (quoting *Maryland v. Craig*, 497 U.S. 836, 845 (1990)).

The Tennessee Supreme Court stated recently that, "[W]hen deciding claims based on the right of confrontation provided in article I, section 9, we have expressly adopted and applied the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment." *State v. Davis*, 466 S.W.3d 49, 68 (Tenn. 2015) (citing *State v. Dotson*, 450 S.W.3d 1, 62 (Tenn. 2014); *State v. Parker*, 350 S.W.3d 883, 898 (Tenn. 2011); *State v. Franklin*, 308 S.W.3d 799, 809-10 (Tenn. 2010); *State v. Cannon*, 254 S.W.3d 287, 301 (Tenn. 2008); *State v. Lewis*, 235 S.W.3d 136, 144-45 (Tenn. 2007)).

In *Maryland v. Craig*, an opinion decided in 1990, the United States Supreme Court addressed whether a Maryland law that allowed a child sexual assault victim to testify via closed circuit television violated the defendant's right to confrontation. In that case, the procedure included that the child witness, the prosecutor, and defense counsel withdrew from the courtroom to another room where the child was examined and cross examined. The proceedings in the separate room were transmitted to the courtroom, where the defendant, judge, and jury remained, by one-way, closed-circuit television. *Id.* at 841. The defendant could talk with his counsel by telephone, and the judge conducted the proceedings in the same manner as if the examination were being held in the courtroom. The Court stated that the defendant's right to confrontation is not "absolute" and that face-to-face confrontation, while preferred, is not an indispensable element of the confrontation rights. *Id.* at 844, 849. It stated that the preference for face-to-face confrontation "must occasionally give way to considerations of public policy and the necessities of the case.'" *Id.* at 849 (quoting *Mattox v, United States*, 156 U.S. 237, 243 (1895)). The *Craig* Court adopted a balancing test and found that in some cases the right to physical confrontation may be denied if necessary to further an important public policy and reliability of the testimony is otherwise assured. *Id.* at 850. The *Craig* Court stated that "the critical inquiry" is "whether use of the procedure [utilized in the *Craig* case] is necessary to further an important state interest." It then concluded that:

> where necessary to protect a child witness from trauma that would be caused by testifying in physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the

Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation. Because there is no dispute that the child witness in this case testified under oath, were subject to full cross-examination and were able to be observed by the judge, jury, and defendant as they testified, we conclude that, to the extent that a proper finding of necessity has been made, the admission of such testimony would be consonant with the Confrontation Clause.

*Id*. at 857. The Court then remanded the case for the trial court to make a specific finding that testimony by the child in the courtroom, in the presence of the defendant would result in the child suffering serious emotional distress such that the child could not reasonably communicate. *Id*. at 858.

In *State v. Deuter*, our supreme court addressed whether the admission of unsworn, ex parte videotaped statements of child victims violated the defendant's right to confrontation. 839 S.W.2d 391, 392 (Tenn. 1992). The court extensively analyzed *Craig* and noted "that the interest to be protected as articulated in *Craig* is the child-witness's *ability to testify* and that to satisfy this interest, the trial court must determine that the trauma to the child would be such that the child's ability to communicate would be impaired by the presence of the defendant rather than the courtroom and proceedings in general." *Id*. at 394. The Court stated that the procedure in the case before it included that the questioning of the child witnesses occurred several months before trial, with only the child and investigators present. It distinguished this procedure with that presented in *Craig* and held that the procedure in *Deuter* did not meet the requirements set forth in *Craig. Id.*

The *Deuter* Court went on to state that the face-to-face language found in the Tennessee Constitution has been held to impose a higher right than that found in the federal constitution. *Id*. at 395. It noted that a Pennsylvania court, interpreting the State's own face-to-face language, stated that "Many people possess the trait of being loose tongued or willing to say something behind a person's back that they dare not or cannot truthfully say to his face or under oath in a courtroom." *Id*. at 395-396 (citing *Commonwealth v. Russo*, 131 A.2d 83, 88 (1957). The *Deuter* court also cited a case from the Indiana Supreme Court that found that the face-to-face provision in Indiana's constitution was violated by the admission of previously recorded videotaped statement during which the defendant could view the witnesses testifying by one-way television, but that "two-way television communication between the defendant and witness could pass constitutional muster." *Deuter*, 839 S.W.2d at 396 (citing *Brady v. Indiana*, 575 N.W.2d 981, 989 (Ind. 1991)).

While multiple cases have reiterated the *Deuter* holding that the "face to face" language found in the Tennessee Constitution imposes a higher standard than that found in the federal constitution, the Tennessee Supreme Court subsequently stated that, "we have found no evidence to have been excluded under our state constitution's confrontation clause that was not also excluded under the federal constitution's counterpart." *See Lewis* 235 S.W.3d at 144.

Unlike *Craig* and *Deuter*, the facts presented in the case herein involve the use of newer two-way video testimony. The United States Supreme Court has not decided what test should govern two-way testimony. *See Wrotten v. New York*, 560 U.S. 959, 960 (2010) (Sotomayor, J., respecting denial of certiorari) (noting some differences between one- and two-way video and stating that the court has not yet decided the appropriate standard to govern two-way testimony). The Supreme Court did, however, reject a proposed change to Federal Rule of Criminal Procedure 26 that would have permitted unavailable witnesses to testify via two-way video. *Order of the Supreme Court*, 207 F.R.D. 89, 91 (2002). In an accompanying statement, Justice Scalia wrote, "I share the majority's view that the Judicial Conference's proposed Fed. Rule Crim. Proc. 26(b) is of dubious validity under the Confrontation Clause of the Sixth Amendment to the United States Constitution . . . ." *Id.* at 93 (statement of Scalia, J.). He added:

> As we made clear in *Craig*, the purpose of the Confrontation Clause is ordinarily to compel accusers to make their accusations *in the defendant's presence*—which is not equivalent to making them in a room that contains a television set beaming electrons that portray the defendant's image. Virtual confrontation might be sufficient to protect virtual constitutional rights; I doubt whether it is sufficient to protect real ones.

*Id.* at 94 (citation omitted.). Justice Scalia expressed skepticism that two-way video technology was constitutionally distinct from the one-way system examined in *Craig*: "I cannot comprehend how one-way transmission (which *Craig* says does not ordinarily satisfy confrontation requirements) becomes transformed into full-fledged confrontation when reciprocal transmission is added." *Id.*

Before making our holding, we acknowledge the cases cited by the State in which other courts in other jurisdictions have held that two-way conferencing is appropriate under certain circumstances. *See State v. Barber*, No. 1 CA-CR-17-0622, 2019 WL 3231189, at *2 (Ariz. Ct. App. July 18, 2019) (upholding the use of two-way conferencing when the witness was the sole caregiver for her 77-year-old husband, who had undergone multiple heart-related treatments and had since developed other complications); *Horn v. Quarterman*, 508 F.3d 306, 320 (5th Cir. 2007) (holding that the

protection of seriously ill witnesses may give rise to the type of necessity required under *Craig* to permit testimony by way of closed-circuit television"); *Cervantes v. State*, No. 10-19-00019-CR, 2019 WL 6607003, at *2-3 (Tex. App. Dec. 4, 2019) (finding no violation of the confrontation clause in allowing a single mother of five who lived in Kansas to testify via Skype).

We further acknowledge that other cases have adopted the standard articulated in *Craig* for one-way transmissions to two-way transmissions. *See Lipsitz v. State*, 442 P.3d 138, 140 (2019) (adopting the *Craig* test and applying it to two-way audiovisual technology in a case where the witness was in a drug rehabilitation program); *City of Missoula v. Duane* 355 P.3d 729 (Mont. 2015) (applying *Craig* based upon the prohibitive costs of witness travel); *State v. Smith*, 308 P.3d 135, 136 (N.M. Ct. App. 2013) (holding that a state-employed scientific analyst's testimony via two-way video about the defendant's blood alcohol content violated the defendant's right to confrontation because the trial court had not determined that such remote testimony was necessary to further an important public interest); *Commonwealth v. Atkinson*, 987 A.2d 743, 751-52 (Pa. Super. Ct. 2009) (holding that allowing an imprisoned witness to testify via two-way videoconferencing technology without a finding of necessity violates the Confrontation Clause).

We find compelling the reasoning articulated by the Eighth Circuit in *United States v. Bordeaux*, 400 F.3d 548, 554 (8th Cir. 2005). That court reasoned that, although two-way videoconferencing might be a better approximation of face-to-face confrontation than one-way video, it was nevertheless virtual and less desirable than in-person testimony. *Id.* The court stated that "'confrontation; via a two-way closed circuit television is not constitutionally equivalent to face-to-face confrontation." *Id.* The *Bordeaux* court went on to state:

> The virtual "confrontations" offered by closed-circuit television systems fall short of the face-to-face standard because they do not provide the same truth-inducing effect. The Constitution favors face-to-face confrontations to reduce the likelihood that a witness will lie. "It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.'" . . . .[T]he touchstone for deciding whether a "confrontation" satisfies the Constitution is whether it is likely to lead a witness to tell the truth to the same degree that a face-to-face confrontation does, and in this respect two-way systems are like one-way systems: they both fall short.

*Id.* (quoting *Coy v. Iowa*, 487 U.S. 1012, 1019 (1988)). Similarly, the 11th Circuit stated that:

- 10 -

The simple truth is that confrontation through a video monitor is not the same as physical face-to-face confrontation . . . . [T]he two are not constitutionally equivalent. The Sixth Amendment's guarantee of the right to confront one's accuser is most certainly compromised when the confrontation occurs through an electronic medium.

*United States v. Yates*, 438 F.3d 1307, 1315-16 (11th Cir. 2006). This contrasts with the 2nd Circuit, which had held that "[u]pon a finding of exceptional circumstances, . . . a trial court may allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice." *United States v. Gigante*, 166 F.3d 75, 81 (2d. Cir. 1999). It went on to hold that the witness's terminal illness satisfied the "exceptional circumstances" requirement. *Id.*

Having reviewed the current state of the law, we conclude that the test articulated in *Craig* provides the bare minimum protections for testimony via two-way communications. We note that, in *Craig*, the procedure involved a child witness still being in the physical presence of both the defense attorney and the prosecutor. The concern addressed was that the child witness would be unable to testify at all in the presence of the defendant. The case in *Craig* triggered multiple public policy considerations, the impact on the victim and also the ability of the State to obtain the testimony of an important witness at all, considering that she could not speak in the defendant's presence. The policy in *Craig* still, however, included that the child witness come to the court house, be sworn, and then go into another room away from the defendant to be examined by the prosecutor and cross-examined by the defense attorney, both of whom were present in the room with the child witness. As previously stated, the witness being present in court, being sworn and then examined in the physical presence of the attorneys provided the defendant some assurance of the veracity of the testimony.

While we concede that two-way videoconferencing more closely approximates face-to-face confrontation, it is in no way constitutionally equivalent to the face-to-face confrontation envisioned by the Sixth Amendment. We respectfully but firmly disagree with the trial court's finding that "if the software works the way it should work, will be, in my opinion, as good as the person being here live." Further, two-way video conferencing allows for the witness to testify remotely and not come to the courthouse at all. The physical presence of the witness in the courthouse is, itself, a significant moment for the witness, during which any witness in a criminal proceeding understands the wide-ranging implications their testimony may have on the life of another. Foregoing in-person testimony potentially removes a witness's understanding of the enormity of those implications. We are not inclined to remove the requirement of physical presence of a witness in the courthouse, save for instances in which the most necessary public policy considerations arise. We hold that face-to-face confrontation in Tennessee means simply

- 11 -

that, face-to-face communication, unless there is some greater public interest that overrides the directives of our great state's constitution.

Having so decided, we remand this case back to the trial court to make a specific finding, using the law as articulated in *Craig*, about the public policy implications triggered by the circumstances of each of the witnesses herein. We highlight that, in *Craig*, the court allowed for one-way closed circuit television where the trial court found: (1) the procedure is necessary to protect the child witness's welfare, (2) the child witness would herself be traumatized specifically by the defendant's presence; *and* (3) the child witness would suffer more than de minimis distress in the defendant's presence. *Id*. 855-56 (emphasis added). Therefore, before permitting a witness to testify via two-way videoconference, the court must make a case-specific and witness-specific determination that the denial of the defendant's confrontation right is necessary to further an important public policy interest. In line with *Craig*, the court should consider the negative implications and or trauma to the witness and relative importance of the testimony. If the court finds that the circumstances weigh in favor of allowing two-way video conferencing, it must do its best to take steps to assure the reliability of the remote testimony. We heed the words in *The Blessings of Liberty*, "A witness 'may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts.'" *Coy* 487 U.S. at 1019 (quoting Zechariah Chaffee, Jr., *The Blessings of Liberty* 35 (1956)).

## II. Conclusion

In accordance with the aforementioned reasoning and authorities, we conclude that the standard as articulated in *Maryland v. Craig*, 497 U.S. 836 (1990), should extend to two-way video conferencing technology. As such we reverse and remand this case to the trial court for a case-specific and witness-specific determination that the denial of the defendant's confrontation right is necessary to further an important public interest.

_____
ROBERT W. WEDEMEYER, JUDGE